

COPY

1   C. P. Bartholomew (State Bar No. 211425)
    cpbartholomew@finkelsteinthompson.com
2   Mark Punzalan (State Bar No. 247599)
    mpunzalan@finkelsteinthompson.com
3   **FINKELSTEIN THOMPSON LLP**
    100 Bush Street, Suite 1450
4   San Francisco, CA 94104
    Telephone: (415) 398-8700
5   Facsimile: (415) 398-8704

6

7   Counsel for Plaintiff                                E-filing

8

9                   **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11                           CV 07    5637

12

13  Wayne Luzon, On Behalf of Himself and All       **COMPLAINT FOR VIOLATION OF THE**
    Others Similarly Situated,                       **FEDERAL SECURITIES LAWS**
14
                    Plaintiff,
15
          vs.
16                                                    **DEMAND FOR JURY TRIAL**
    BIGBAND NETWORKS, INC., AMIR
17  BASSAN-ESKENAZI, RAN OZ, FREDERICK
    BALL, GAL ISRAELY, DEAN GILBERT,
18  KEN GOLDMAN, LLOYD CARNEY,                        **CLASS ACTION**
    BRUCE SACHS, ROBERT SACHS,
19  GEOFFREY YANG, MORGAN STANLEY &
    CO., INC., MERRILL LYNCH, PIERCE,
20  FENNER & SMITH INC., JEFFERIES & CO.,
    INC., COWEN & CO., INC., and
21  THINKEQUITY PARTNERS, LLC

22
                    Defendants.
23

24

25

26

27

28

                                  1
                     CLASS ACTION COMPLAINT

1.     This is a securities class action brought on behalf of all purchasers of the common stock of BigBand Networks, Inc. ("BigBand" or the "Company") between March 14, 2007 and September 27, 2007 (the "Class Period"), including purchasers in BigBand's March 15, 2007 Initial Public Offering ("IPO"), against the Company, its Board of Directors, its officers, and the Underwriters to the IPO for violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

## INTRODUCTION

2.     BigBand Networks, Inc. (NASDAQ: BBND) is a manufacturer and seller of digital video and data processing platforms in areas such as digital TV, high definition TV, video telephony and voice-over-IP.

3.     On March 20, 2007, the Company closed the initial public offering of shares of its common stock. BigBand sold 7,500,000 shares of common stock, and the Company's selling stockholders sold an aggregate of 4,805,000 shares of common stock, which included the underwriters' exercise in full of their option to purchase up to 1,605,000 shares. BigBand received $90,675,000 in net proceeds from the IPO, and the selling stockholders received an aggregate amount of $58,092,450.

4.     Through their representations in the Registration Statement and Prospectus filed in connection with the Company's IPO, Defendants misled the investing public throughout the Class Period. Defendants failed to inform the public that BigBand was having a number of issues customizing and integrating its switched digital video services with a number of its customers. In addition, Defendants failed to disclose to investors that Verizon, one of BigBand's major customers, had been unable to work off excessive amounts of inventory and that this would substantially affect BigBand's revenues.

5.     BigBand did not disclose any of these material facts to investors until it issued a press release on September 27, 2007. In the press release, BigBand stated the Company expected to post an operating loss for the third quarter 2007 and would have to dramatically revise its revenue outlook for the third quarter 2007. The Company stated that it expected to

2
CLASS ACTION COMPLAINT

1    report revenue for the third quarter in the range of $35 to $39 million, well below the Company's

2    previous guidance of $54 to $58 million.  The Company revealed for the first time that a) its

3    customers were having customization and integration issues with the Company's switched digital

4    video technology, and b)  the Company's Telco-TV revenue had experienced a slowdown due to

5    a "major customer" having to "work[] through previously purchased inventory."

6        6.    As a result of Defendants' false and misleading Class Period statements and

7    omissions, BigBand's stock traded at inflated levels during the Class Period.  Once the

8    Company's true financial condition was revealed, BigBand shares fell 28% in value, to close at

9    $6.40 per share on September 28, 2007, a 51% drop from the $13 per share price during the

10    Company's IPO.

11

12                        **JURISDICTION AND VENUE**

13        7.    This action arises under Sections 10(b) and 20(a) of the Exchange Act of 1934, 15

14    U.S.C. §§ 78j(b), 78(n) and 78t(a), Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k

15    and 77o, and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5,

16    promulgated thereunder.

17        8.    This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331

18    and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19        9.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28

20    U.S.C. § 1391(b).  BigBand's principal place of business was in this district at all times relevant

21    to this action, and many of the acts charged herein, including the dissemination of materially

22    false and misleading information in connection with the sale of a security, occurred in this

23    district.

24        10.    In connection with the acts alleged in this complaint, the defendants, directly or

25    indirectly, used means and instrumentalities of interstate commerce, including but not limited to

26    the mails, interstate telephone and Internet communications.

27

28

**PARTIES**

11.    Plaintiff Wayne Luzon purchased shares of BigBand common stock during the Class Period and was damaged thereby, as reflected in the certification filed herewith.

12.    Defendant BigBand is incorporated in Delaware and headquartered at 475 Broadway Street, Redwood City, California 94063. Founded in 1998, BigBand provides broadband service providers with video-networking platforms to provide delivery of video, voice and data.

13.    Defendant Amir Bassan-Eskenazi is, and was at all relevant times, Chief Executive Officer ("CEO"), President, Co-founder and Chairman of the Board of Directors of the Company.

14.    Defendant Frederick A. Ball ("Ball") was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of the Company. Frederick Ball stepped down as Chief Financial Officer on October 18, 2007.

15.    Defendant Ran Oz ("Oz") is, and was at all relevant times, Executive Vice President and Chief Technology Officer of the Company.

16.    Defendant Lloyd Carney ("Carney") is, and was at all relevant times, a director of the Company.

17.    Defendant Dean Gilbert ("Gilbert") is, and was at all relevant times, a director of the Company.

18.    Defendant Kenneth A. Goldman ("Goldman") is, and was at all relevant times, a director of the Company.

19.    Defendant Gal Israely ("Israely") is, and was at all relevant times, a director of the Company. Israely is a managing partner of Cedar Funds. After the IPO, Cedar Funds owned 4.4% of the outstanding shares of the Company.

20.    Defendant Bruce I. Sachs ("Bruce Sachs") is, and was at all relevant times, a director of the Company. Bruce Sachs is a partner at Charles River Ventures. After the IPO, Charles Rivers Ventures owned 19% of the outstanding shares of the Company.

CLASS ACTION COMPLAINT

1    21.    Defendant Robert J. Sachs ("Robert Sachs") is, and was at all relevant times, a

2  director of the Company.

3    22.    Defendant Geoffrey Y. Yang ("Yang") is, and was at all relevant times, a director

4  of the Company.  Yang is a Partner at Redpoint Ventures.  After the IPO, Redpoint Ventures

5  owned 22.5% of the outstanding shares of the Company.

6    23.    Defendants Bassan-Eskenazi, Ball, Oz, Carney, Gilbert, Goldman, Israely, Bruce

7  Sachs, Robert Sachs, and Yang are referred to herein as the "Individual Defendants."  The

8  Individual Defendants, because of their positions with the Company, possessed the power and

9  authority to control the contents of BigBand's quarterly reports, press releases, and presentations

10  to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

11  Each Defendant was provided with copies of the Company's reports and press releases alleged

12  herein to be misleading prior to or shortly after their issuance and had the ability and opportunity

13  to prevent their issuance or cause them to be corrected.  Because of their positions and access to

14  material non-public information available to them but not to the public, each of these defendants

15  knew that the adverse facts specified herein had not been disclosed to and were being concealed

16  from the public and that the positive representations which were being made were then

17  materially false and misleading.  The Individual Defendants are liable for the false statements

18  pleaded herein, as those statements were each "group-published" information, the result of the

19  collective actions of the Individual Defendants.

20    24.    Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") is a global financial

21  services firm that provides products and services to corporations, governments, financial

22  institutions and individuals.  Morgan Stanley acted as underwriter and financial advisor to

23  BigBand in connection with the Company's IPO and helped draft and disseminate documents

24  related to the Company's offering.

25    25.    Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") provides capital

26  markets services, investment banking and advisory services, wealth management, asset

27  management, insurance, banking and related products and services on a global basis.  Merrill

28

1  Lynch acted as underwriter and financial advisor to BigBand in connection with the Company's

2  IPO and helped draft and disseminate documents related to the Company's offering.

3       26.    Jeffries & Co., Inc. ("Jeffries") is a full-service global investment bank and

4  institutional securities firm focusing on growing companies and their investors.  Jeffries acted as

5  underwriter and financial advisor to BigBand in connection with the Company's IPO and helped

6  draft and disseminate documents related to the Company's offering.

7       27.    Cowen & Co., LLC ("Cowen") provides services in correspondent clearing and

8  execution services, research, institutional sales and trading, retail brokerage and investment

9  banking.  Cowen acted as underwriter and financial advisor to BigBand in connection with the

10  Company's IPO and helped draft and disseminate documents related to the Company's offering.

11       28.    ThinkEquity Partners, LLC ("ThinkEquity") is an investment banking firm

12  providing a number of investment related services.  ThinkEquity acted as underwriter and

13  financial advisor to BigBand in connection with the Company's IPO and helped draft and

14  disseminate documents related to the Company's offering.

15                        **CLASS ACTION ALLEGATIONS**

16       29.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the

17  Federal Rules of Civil Procedure, on behalf of a class of persons and entities who purchased

18  BigBand securities during the Class Period and in conjunction with the Company's IPO (the

19  "Class").  Excluded from the Class are Defendants herein, officers and directors of BigBand,

20  members of their immediate families, and the heirs, successors or assigns of any of the

21  foregoing.

22       30.    The Class is so numerous that joinder of all members is impracticable.  As of

23  August 7, 2007, BigBand had 58,717,590 shares of common stock issued and outstanding.  This

24  number was memorialized in BigBand's August 10, 2007 Form 10-Q filed with the SEC.

25       31.    Plaintiff will fairly and adequately protect the interests of the members of the

26  Class.  Plaintiff has no interests which are contrary to, or in conflict with, the interests of the

27  Class members that they seek to represent.  Plaintiff has retained competent counsel, experienced

28

1  in class action litigation under the federal securities laws to ensure such protection, and intends

2  to prosecute this action vigorously.

3      32.     A class action is superior to all other available methods for the fair and efficient

4  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

5  the damages suffered by individual members of the Class may be relatively small, the expense

6  and burden of individual litigation make it impossible for the members of the Class to

7  individually seek redress for the wrongs done to them.  There will be no difficulty in the

8  management of this action as a class action.

9      33.     Questions of law and fact common to the members of the Class predominate over

10  any questions that may affect only individual members in that Defendants have acted on grounds

11  generally applicable to the entire Class.  Among the questions of law and fact common to the

12  Class are:

13          i.      whether the federal securities laws were violated by Defendants' acts as

14      alleged herein;

15          ii.     whether Defendants' publicly disseminated releases and statements during the

16      Class Period, omitted and/or misrepresented material facts, and whether Defendants

17      breached any duty to convey material facts or to correct material facts previously

18      disseminated;

19          iii.    whether Defendants participated in and pursued the common course of

20      conduct complained of herein;

21          iv.     whether Defendants acted with scienter in omitting and/or misrepresenting

22      material facts;

23          v.      whether Defendants concealed the customization problems its customers were

24      having with the Company's switched digital video services;

25          vi.     whether Defendants concealed the inventory issues faced by one of its major

26      customers;

27

28

CLASS ACTION COMPLAINT

vii.    whether the market prices of BigBand securities during the Class Period were artificially inflated because of the Defendants' material misrepresentations complained of herein; and

viii.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.    Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### BigBand's Statements Surrounding the IPO

35.    BigBand is a developer of market-based platforms for cable operators and telephone companies to provide video, voice and data services.

36.    On March 14, 2007, the Company published a news release announcing its Initial Public Offering (IPO) of 10,700,000 of its common stock at a price of $13.00.  As the release stated:

> Of those shares, BigBand Networks will sell 7,500,000 shares and selling stockholders will sell 3,200,000 shares.  Several of its stockholders have granted the underwriters the right to purchase an additional 1,605,000 shares of common stock to cover over-allotments.  BigBand's common stock will be listed on the Nasdaq Global Market under the symbol "BBND" and will begin trading on March 15, 2007.
>
> Morgan Stanley and Merrill Lynch & Co. acted as joint book-running managers for the offering, with Jefferies & Company, Cowen and Company, and ThinkEquity Partners LLC serving as co-managers.

37.    On March 15, 2007, BigBand filed its Registration Statement and Prospectus ("Prospectus"), Form 424B4, with the SEC in connection with the Company's IPO.

38.    In the Prospectus, BigBand stated that it generally operated on a nine to eighteen month sales cycle but that once its products were deployed, subsequent purchases would have a more compressed sales cycle.  As the Prospectus stated:

> Our sales cycle for an initial customer purchase typically ranges from nine to eighteen months, but can be longer.  This process generally involves several stages before we can recognize revenues on the sale of our products.  As a provider of advanced technologies,

8

1
2
3
4
5
6
7
8

we seek to actively participate with our existing and potential customers in the evaluation of their technology needs and network architectures, including the development of initial designs and prototypes. Following these activities, we typically respond to a service provider's request for proposal, configure our products to work within our customer's network architecture, and test our products first in laboratory testing and then in field environments to ensure interoperability with existing products in the service provider's network. Following testing, our revenue recognition depends on satisfying complex customer acceptance criteria specified in our contract with the customer and our customer's schedule for roll-out of the product. Completion of several of these stages is substantially outside of our control, which causes our revenue patterns from a given customer to vary widely from period to period. After initial deployment of our products, subsequent purchases of our products typically have a more compressed sales cycle.

9       39.    This statement was materially false and misleading when made because at the

10   time of the Company's IPO, Defendants knew that the Company was having several issues with

11   its customers. Specifically, the Company was having issues customizing and integrating its

12   switched digital video services with a number of its customers, yet Defendants failed to disclose

13   this material fact to its investors.

14       40.    The Company also stated that BigBand products were sold to a limited number of

15   customers and that net revenues would be highly concentrated in a small number of customers.

16   The Prospectus stated in relevant part:

17
18
19
20
21
22

Due to the nature of the cable and telecommunications industries, we sell our products to a limited number of large customers, which have varied over time. For the quarter ended December 31, 2006 and the years ended December 31, 2006, 2005 and 2004, we derived approximately 90%, 79%, 69% and 61% of our net revenues from our top five customers, respectively. In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. We believe that for the foreseeable future our net revenues will be highly concentrated in a relatively small number of large customers.

23

24       41.    This statement was materially false and misleading because at the time of the IPO,

25   Defendants knew that Verizon, one of BigBand's major customers, had been unable to work off

26   excessive amounts of inventory to the point that BigBand's revenues would be substantially

27   affected. Defendants failed to disclose this material fact to its investors.

28

42.    On May 3, 2007, the Company reported a first-quarter net loss of $1 million ($.05 a share).  The Company posted a first quarter revenues of $52.8 million, but these results were significantly below the estimates expected by Thomson Financial analysts who expected second-quarter revenue of $55.7 million.  On this news, shares of BigBand fell 12% to close at $18.10 on May 4, 2007.

43.    In spite of these results, BigBand published a press release on May 3, 2007 and quoted Defendant Bassan-Eskenazi lauding the Company's "strong financial results" for the first quarter 2007.  As Bassan-Eskenazi stated:

> During the quarter, we continued to see an expansion of our installed base of solutions and of the capacity of our existing footprint, which favorably benefited our gross margin....
>
>         ...
>
> We are delighted to report strong financial results for the first quarter of 2007, our first quarter as a public company...  Some of the world's largest cable and telecommunications carriers continue to demonstrate interest in our media services platforms, built upon a unique combination of networking, video processing and bandwidth management capabilities.
>
> We believe that our financial achievements to date demonstrate the increasing consumer demand for more and better video services, including high-definition programming.  Our growth continues to be a function of the broader adoption of our switched broadcast solution by major cable operators and the increasing deployment of television services by telecommunications carriers, among many other initiatives.
>
> Looking ahead, we are optimistic about our business and long-term market opportunity.  We expect to further leverage our platform and gain footprint with new customers in new geographies. BigBand Networks continues to innovate, and we believe our technology will remain a key point of differentiation in the future...

44.    In addition, the press release contained an optimistic outlook for the Company that listed expected net revenues for the second quarter of 2007 to be in the range of approximately $52 to $56 million.  For the fiscal year 2007, Defendant anticipated revenues to be in the range of approximately $225 to $230 million.

45.    On August 2, 2007, BigBand issued a press release stating that the Company had lowered its profit outlook range for the year and that the Company's operating expenses could be

higher than previously expected. Although BigBand had previously forecasted earnings of 6 cents to 11 cents a share for the year, BigBand now expected earnings of 3 cents to 8 cents per share for the year. On a non-GAAP basis, the company said that it expected earnings of 28 cents to 33 cents per share, down from a previous forecast of 30 cents to 35 cents per share. Further, although the Company had previously capped its yearly operating expense estimate at $120 million, the Company stated that its operating expenses could be as high as $121 million for the year. On this news, shares of BigBand dropped 30% to close at $10.10 per share on August 3, 2007.

46.    Despite these revised lower revenue forecasts, Bassan-Eskenazi continued to represent to investors that the Company was poised for "additional growth" and continued to present an optimistic business outlook. As Bassan-Eskenzai stated:

> We are pleased with our improvements in both revenues and earnings results in the second quarter... We continued to drive significant expansion of the footprint of our media services platforms. We continue to work closely with customers in supporting their efforts to enhance their existing networks for advanced video services. We believe that BigBand's solutions for switched broadcast and TelcoTV will continue to gain traction with major customers both in the U.S. and internationally.
>
> ...
>
> ...Video continues to be a major driver of capital expenditures in service provider networks. We believe that our technology innovation and time-to-market leadership are key competitive differentiators in our video and data markets. Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. We continue to be well-positioned for additional growth over the long-term and are optimistic about our business.

47.    In a conference call to investors on August 2, 2007, Bassan-Eskenazi further stated that BigBand continued to grow as a result of the "healthy demand for the unique video solutions which drive strategic foorprint growth with key customers." In addition, because of the increased competition among cable, satellite and telecom providers, in the second Quarter the company "experienced footprint growth, meaningful design wins, and significant milestones."

**The True Condition of BigBand Comes to Light**

48.    On September 27, 2007, BigBand issued a press release that stated the Company expected to post an operating loss for the third quarter 2007 and would have to dramatically revise its revenue outlook for the third quarter 2007.  The Company stated that it expected to report revenue for the third quarter in the range of $35 to $39 million, well below the Company's previous guidance of $54 to $58 million.    On this news, BigBand shares fell 28% in value, to close at $6.40 per share on September 28, 2007, a 51% drop from the $13 per share price during the Company's IPO.

49.    In its press release, BigBand stated, for the first time, a number of reasons for the decreased revenue outlook.  As BigBand stated:

> The lower revenue outlook is due to several coincident factors. BigBand has been deploying switched digital video across an expanding number of customers and configurations. Some of these ongoing deployments have required more software customization and integration than originally expected.  This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter. The Company also experienced slowdown in Telco-TV revenue, as its major customer worked through some previously purchased inventory. Finally, the Company experienced continued softness in its data business. As a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007.

50.    On September 28, 2007, market analysts Morgan Keegan and Jeffries downgraded BigBand stock in the aftermath of BigBand's admission.  As Jefferies analyst George Notter noted, the Company's performance had become very difficult to gauge because of "a lack of clarity about the timing of product deployments, and the timing of revenue recognition."

51.    BigBand's stock traded at inflated levels during the Class Period as a result of Defendants' false and misleading statements and omissions regarding the customization and integration of its switched digital video functions.  The stock traded as high as $21.49 per share by May 3, 2007.  However, on September 27, 2007, when the Company first admitted the problems of which it had been aware since the IPO, the stock traded at $5.89 a share.

1

## DEFENDANTS ACTED WITH SCIENTER

2      52.    Each Individual Defendant had knowledge of BigBand's problems and was

3  motivated to conceal such problems.  Defendants knew that the Company was having a number

4  of issues customizing and integrating its switched digital video services with a number of its

5  customers.  Defendants also knew that Verizon, one of BigBand's major customers, had been

6  unable to work off excessive amounts of inventory.  Defendants knew that disclosure of this

7  information would substantially affect BigBand's revenues.

8      53.    Defendants Bassan-Eskenazi, Ball, Oz, Carney, Gilbert, Goldman, Israely, Bruce

9  Sachs, Robert Sachs, and Yang, were responsible for the reports and claims relating to BigBand

10  as well as the press releases issued by the Company.  Each Individual Defendant knew the

11  Company's issues with its customers would have a significant impact on the Company's

12  earnings, and were motivated to engage in the fraudulent practices alleged herein.

13

## LOSS CAUSATION ALLEGATIONS

14      54.    BigBand common stock was publicly traded in an efficient market at all relevant

15  times.  As described, *supra*, Defendants' material misrepresentations and omissions had the

16  effect of creating and maintaining artificially inflated prices for BigBand securities.  The

17  continued misrepresentations regarding the Company's condition served to maintain BigBand's

18  share price at artificially inflated levels during the Class Period.

19      55.    Defendants had a duty to promptly disseminate accurate and truthful information

20  with respect to any issues BigBand was having with its major customers or to cause and direct

21  that such information be disseminated and to promptly correct any previously disseminated

22  information that was misleading to the market.  As a result of their failure to do so, the price of

23  BigBand's common stock was artificially inflated during the Class Period, damaging Plaintiff

24  and the Class.

25      56.    Until shortly before Plaintiff filed this Complaint, he was unaware of all of the

26  facts, as described herein, and could not have reasonably discovered the Defendants' fraudulent

27  scheme by the exercise of reasonable diligence.

28

CLASS ACTION COMPLAINT

57.     Defendants' false and misleading statements and omissions in their press releases and other public statements directly caused the losses of the Plaintiff and the Class members.  On the strength of these false statements, misrepresentations and material omissions, the Company's stock was artificially inflated during the Class Period.

58.     The timing and magnitude of the decline in the value of BigBand's stock price negates any inference that the loss suffered by Plaintiff and the Class was the result of factors unrelated to Defendants' fraudulent conduct.

## FRAUD ON THE MARKET ALLEGATIONS

59.     At all relevant times, the market for BigBand securities was an efficient market for the following reasons, among others:

   i.      At all relevant times during the Class Period, BigBand's common stock was listed and actively traded either over the counter or on the NASDAQ, a highly efficient national market.

   ii.     As a registered and regulated issuer of securities, BigBand filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint.

   iii.    Numerous financial analysts followed the Company's stock.  Thus, the Company's stock reflected the effect of information disseminated in the market.

60.     As a result of the above, the market for BigBand securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' prices.  Under these circumstances, all purchasers of BigBand securities during the Class Period suffered similar injury through their purchase of securities at prices which were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

61.     The statutory safe harbor for certain forward-looking statements does not apply to the misrepresentations and omissions alleged in this complaint.  Many of the statements were not specifically identified as "forward-looking statements" when made.  To the extent that there were

14

1    any properly identified forward-looking statements, there were no meaningful cautionary

2    statements identifying the important, then-present factors that could and did cause actual results

3    to differ materially form those in the purportedly forward-looking statements.  Alternatively, to

4    the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

5    herein, Defendants are nonetheless liable because at the time each of the misrepresentations was

6    made, the particular speakers knew that the statement was false or misleading at that time.

7        62.    Any warnings or other cautionary language contained in the press releases and

8    other public statements described herein were generic, "boilerplate" statements of risk that would

9    affect any similar company, and misleadingly contained no factual disclosure of any of the

10   problems with the Company which placed the ability of the Company to accurately depict its

11   own financial situations into serious question.  As such, any forward-looking statements

12   complained of herein were not accompanied by meaningful cautionary language.

13       63.    Any relevant purported risk disclosures were, in fact, false and misleading in and

14   of themselves, by virtue of the fact that the events which the risk disclosures purported to warn

15   against as contingencies had frequently already become a reality or a certainty.

16                              **CLAIMS FOR RELIEF**

17                                  **COUNT I**

18   **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

19                           **Against All Defendants)**

20       64.    Plaintiff incorporates by reference and realleges all preceding paragraphs as

21   though fully set forth herein.

22       65.    During the Class Period, Defendants disseminated or approved the false

23   statements specified above, which they knew or deliberately disregarded were misleading in that

24   they contained misrepresentations and failed to disclose material facts necessary in order to make

25   the statements made, in light of the circumstance under which they were made, not misleading.

26       66.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

27             i.      employed devices, schemes and artifices to defraud;

28

ii.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

iii.     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of BigBand common stock during the Class Period.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BigBand common stock. Plaintiff and the Class would not have purchased BigBand common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

68.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of BigBand common stock during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

69.     Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

70.     The Individual Defendants acted as controlling persons of BigBand within the meaning of §20(a) of the Exchange Act. By reason of their position with the Company and their ownership of BigBand common stock, the Individual Defendants had the power and authority to cause BigBand to engage in the wrongful conduct complained of herein. BigBand controlled the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and BigBand are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the members of the Class damages, interest and costs;

1       C.      Awarding Plaintiff reasonable costs and attorneys' fees; and

2       D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

3               proper.

4                              **JURY DEMAND**

5   Plaintiff demands a trial by jury.

6

7   Dated: November 6, 2007              Respectfully submitted,

8                              **FINKELSTEIN THOMPSON LLP**

9

10                             MARK PUNZALAN

11                             Christine Pedigo Bartholomew

12                             100 Bush Street, Suite 1450
                                San Francisco, CA 94104

13                             Telephone: 415.398.8700
                                  Facsimile: 415.398.8704

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## PLAINTIFF CERTIFICATION

I, Wayne Luzon, hereby declare that:

1.    I have reviewed a draft Complaint in this class action and have authorized the filing thereof.

2.    I did not purchase (or otherwise acquire) or sell securities of BigBand Networks, Inc., the subject of the Complaint, at the direction of my counsel or in the hope to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

3.    I am willing to serve as a representative plaintiff on behalf of the class defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.    I have engaged in the following transactions involving the securities of BigBand Networks, Inc.:

| Purchases | Trade Date | Price Per Security | Total | |
|-----------|-----------|--------------------|-------|---|
| 100 | 5/11/2007 | 17.36 | 1760.95 | ROTH IRA |
| 100 | 5/14/2007 | 17.70 | 1794.95 | ROTH IRA |
| 100 | 4/23/2007 | 18.50 | 1862.99 | UGMA |

| Sales | Date | Price Per Security | Total |
|-------|------|--------------------|-------|
| | | | |

5.    During the last three years preceding the date of this Certification, I have sought to serve as a representative plaintiff on behalf of a class in the following actions brought under the Securities Act of 1933 or the Securities Exchange Act of 1934:

6.    I will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, except as ordered by the Court.

7.    Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _31_ day of October, 2007.

Wayne Luzon



COPY

E-filing

WHA

1  C.P. Bartholomew (State Bar No. 211425)
   cpbartholomew@finkelsteinthompson.com
2  Mark Punzalan (State Bar No. 247599)
   mpunzalan@finkelsteinthompson.com
3  **FINKELSTEIN THOMPSON LLP**
   100 Bush Street, Suite 1450
4  San Francisco, California 94104
   Telephone: (415) 398-8700
5  Facsimile: (415) 398-8704

6
   Counsel for Plaintiff
7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11  Wayne Luzon, On Behalf of Himself and
12  All Others Similarly Situated,
13                    ,                          **NOTICE OF RELATED ACTION**
                    Plaintiff,
14
15              vs.                              **CLASS ACTION**

16  BIGBAND NETWORKS, INC., AMIR
    BASSAN-ESKENAZI, RAN OZ,
17  FREDERICK BALL, GAL ISRAELY,
    DEAN GILBERT, KEN GOLDMAN,
18  LLOYD CARNEY, BRUCE SACHS,
    ROBERT SACHS, GEOFFREY YANG,
19  MORGAN STANLEY & CO., INC.,
    MERRILL LYNCH, PIERCE, FENNER &
20  SMITH INC., JEFFERIES & CO., INC.,
    COWEN & CO., INC., and
21  THINKEQUITY PARTNERS, LLC

22                 Defendants.

23

24  PLEASE TAKE NOTICE THAT:

25       Pursuant to Civil Local Rule 3-12, Plaintiff Wayne Luzon gives notice that the

26  above-captioned matter appears to be related to the following actions presently pending in

27  the Northern District of California:

28

                                      1

1    *Brodsky v. BigBand Networks, Inc., et al.*, 3:07-cv-05141

2    *Koesterer v. BigBand Networks, Inc., et al.*, 3:07-cv-05168

3    *Mohanty v. Bassan-Eskenazi et al.*, 4:07-cv-05101

4    *Smith v. BigBand Newtorks, Inc. et al.*, 3:07-cv-05361

5    *Winston v. BigBand Networks, Inc. et al.*, 3:07-cv-05327.

6    These actions: (1) concern substantially the same parties, property, transaction or event, and

7    (2) it appears likely that there will be an unduly burdensome duplication of labor and

8    expense or conflicting results if these cases are conducted before different Judges.

9        Specifically, these actions stem from Defendants' false and misleading statements

10   contained in the Company's Registration Statement and Prospectus filed in connection with

11   the Company's March 15, 2007 Initial Public Offering. The statements resulted in the

12   artificial inflation of the price of BigBand common stock during the Class Period. Based on

13   these same events, Plaintiff asserts causes of action for violations of Section 10(b) and 20(a)

14   of the Securities Exchange Act of 1934.

15       Accordingly, Plaintiff Wayne Luzon respectfully requests this action be related to

16   3:07-cv-05141, 3:07-cv-05168, 4:07-cv-05101, 3:07-cv-05361, and 3:07-cv-05327.

17

18   DATED: November 6, 2007            Respectfully submitted,

19                           **FINKELSTEIN THOMPSON LLP**

20

21                           MARK PUNZALAN

22

23                           Christine Pedigo Bartholomew
                        100 Bush Street, Suite 1450

24                           San Francisco, CA 94104
                        Telephone: 415.398.8700

25                           Facsimile: 415.398.8704

26

27

28